UNITED STATES of America, Plaintiff,

v.

ADAMO WRECKING COMPANY, Defendant.

Cr. No. 5–80297.

United States District Court, E. D. Michigan, S. D.

June 6, 1975.

Peter Jerome Kelley, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

John E. S. Scott, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS COUNT I AND HOLDING A DECISION AS TO COUNT II IN ABEYANCE

PHILIP PRATT, District Judge.

### I.

Defendant, Adamo Wrecking Company, is charged in a superseding indictment with violating the Clean Air Act of 1970,[1] in connection with the demolition of a building at 2612 Carter, Detroit, Michigan. Count I alleges that defendant did "knowingly cause the emission of asbestos" before demolition of the structure, in violation of 42 U.S.C. § 1857c–7(c)(1)(B), and 40 C.F.R. § 61.22(d)(2)(i).[2] Count II alleges that de-

---

1. The pertinent provision of that Act provides: "After the effective date of any emission standard under this section—
(B) * * * no air pollutant to which such standard applies may be emitted from any stationary source in violation of such standard * * *"

2. 40 C.F.R. § 61.22 provides:
"(d) Demolition: Any owner or operator of a demolition operation who intends to demolish any institutional, commercial, or industrial building (including apartment buildings having more than four dwelling units), structure, facility, installation, or portion thereof which contains any boiler, pipe, or load-supporting structural member that is insulated or fireproofed with friable asbestos material shall comply with the requirements set forth in this paragraph.
(2) The following procedures shall be used to prevent emissions of particulate asbestos material to outside air:
(i) Friable asbestos materials, used to insulate or fireproof any boiler, pipe, or load-supporting structural member, shall be wetted and removed from any building, structure, facility, or installation subject to this para-

fendant knowingly made false statements concerning the existence of friable asbestos materials at the demolition site, in violation of 42 U.S.C. § 1857c–8(c)(2) and 40 C.F.R. § 61.22(d)(1).

Defendant moves, pursuant to Federal Rule of Criminal Procedure 12(b), to dismiss both counts on the grounds:

1. That the indictment fails to allege an essential element of the offense; to-wit, emission of pollutants in violation of an emissions standard;

2. That even if the indictment is deemed facially sufficient in that respect, it fails to allege an emission in violation of a standard because 40 C.F.R. § 61.22(d) does not constitute an "emissions standard";

3. That the indictment fails to charge an offense because the government is unable to produce evidence of a prohibited emission;

4. That the indictment is impermissibly vague and unspecific in that it is premised on a "work practice" as opposed to a standard, fails to specify a subsection of § 1857c–7, and is based on an unconstitutionally vague regulation, namely, 40 C.F.R. § 61.22(d);

5. The indictment fails to charge an offense because the Administrator exceeded his statutory authority;

6. That it is defective because there is no "emissions standard" as required by 42 U.S.C. § 1857c–7(b)(1)(B);

7. That it fails to charge an offense in that 40 C.F.R. § 61.22 is an unauthorized dictate of the method by which buildings are to be demolished.

Defendant attacks the validity of Count II on the ground that 40 C.F.R. § 61.22 is unauthorized and that there can be no knowing failure to report an activity which is described by statute in an unconstitutionally vague manner.

The government responds, contesting both the merits of the motion and the jurisdiction of this Court to entertain the motion under 42 U.S.C. § 1857h–5(b)(1) and (2). In view of the jurisdictional assertions by the government, this Court must consider its power to hear each of defendant's contentions. Thus, the Court will first direct its attention to those arguments which are clearly within its purview (Part II). It will then proceed to evaluate, insofar as necessary, the remainder of the claims concerning Count I in both a jurisdictional (Part III) and substantive (Part IV) framework. Defendant's challenges to Count II will be discussed, in a limited sense, in Part V.

## II.

The jurisdictional limitations of § 1857h–5 apply only to judicial review of "actions of the Administrator in promulgating an emissions standard." Thus, § 1857h–5 does not, in any sense, curtail this Court's jurisdiction to judge purely facial challenges to an indictment. Consequently, the Court may proceed to the merits of three of defendant's arguments: that the indictment omits an allegation of violation of the standard; that the indictment should be dismissed for insufficient evidence; and that it fails to state a particular subsection of § 1857c–7. It is perhaps prudent at the outset to note that the Court cannot perceive the relevance of these arguments to Count II [3] of the indictment; and therefore, its discussion refers only to Count I.

### A. *Failure to Allege Violation of Standard.*

Defendant argues that the indictment is fatally defective in that it fails to allege an essential element of the offense, namely, an

---

graph before wrecking of load-supporting structural members is commenced."

**3.** Count II charges failure to file written notice of intention to demolish a structure containing asbestos, in accordance with 42 U.S.C. § 1857c–8(c)(2) and 40 C.F.R. § 61.22(d)(1). As such, it is not related to a failure to allege

emission in violation of a standard under 42 U.S.C. § 1857c–7, failure to state a subsection of 1857c–7, or insufficient evidence of prohibited emission. Even were the Court to invalidate Count I on those grounds, the government could still proceed on Count II.

emission in violation of a standard. Defendant is correct in its insistence that such an allegation is necessary, for it is well-settled that:

"An indictment is required to set forth the elements of the offense sought to be charged. 'The true test of the sufficiency of an indictment is * * * whether it contains the elements of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet.'" *U. S. v. Debrow,* 346 U.S. 374, 376, 74 S.Ct. 113, 114, 98 L.Ed. 92 (1953); *Russell v. U. S.,* 369 U.S. 749, 82 S.Ct. 1038 (1961); *U. S. v. Levinson,* 405 F.2d 971 (6th Cir. 1968)).

The instant offense consists of the emission of asbestos in violation of an emission standard, as provided in § 1857c–7:

"(c)(1) After the effective date of any emission standard under this section—

\* \* \* \* \* \*

(B) No air pollutant to which such standard applied may be *emitted* * * * *in violation of such standard* * * * *"

40 C.F.R. § 61.22(d)(2)(i) states the applicable standard:[4]

"Friable asbestos materials used to insulate or fireproof * * * shall be wetted and removed from any * * * structure * * * before wrecking of load-supporting structural members is commenced * * * *"

Thus, Count I of the indictment must allege both the element of emission[5] and violation of the standard. The latter allegation is conspicuously absent, in those terms. However, the Court does not view that omission as a fatal defect.

■ While an indictment must set forth each essential element in an intelligible manner, the standard for judging its sufficiency is governed by Federal Rule of Criminal Procedure 7(c), which provides, inter alia:

"The indictment * * * shall be a plain, concise and definite written statement of the essential facts constituting the offense charged * * *. It need not contain * * * any other matter not necessary to such statement * * *"

Thus, the measure of sufficiency is not overly technical:

"Although an indictment is subject to careful examination * * * not all lapses from precision and correctness require that an indictment be quashed." (*U. S. v. Levinson, supra,* at 977).

■ In judging the existence of essential elements, courts have generally looked to the substance, rather than the form, of the indictment. Quotation of statutory language suffices only if it is clear and meaningful (*U. S. v. Carll,* 105 U.S. 611, 26 L.Ed. 1135 (1881)). An indictment must, therefore, compensate for imprecise, overbroad, or generic aspects of the statute. (See, e. g. *U. S. v. Cruikshank,* 92 U.S. 542, 558, 23 L.Ed. 588 (1875); *Morissette v. U. S.,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1951); *U. S. v. Russell, supra*). Thus, an allegation that defendant was in violation of the standard, without more, though taken from the statute, might well be inadequate to apprise defendant of the nature of a necessary element.[6]

■ Inasmuch as there is no particular magic in the use of verbatim statutory language, it is not a requisite for sufficiency. As the Sixth Circuit explained in *Rudin v. U. S.,* 254 F.2d 45, 48 (1958), cert. den. 357 U.S. 930, 78 S.Ct. 1374, 2 L.Ed.2d 1371:

---

**4.** Defendant vigorously asserts that the within quoted regulation is not a "standard." However, that argument is not relevant to the contention that the indictment fails to say "in violation of a standard" and will be considered separately, infra.

**5.** Defendant concedes that "emission" is properly alleged, and confines its argument to the failure to allege violation of a standard.

**6.** Even in combination with an allegation that defendant was "in violation of 40 C.F.R. § 61.-22," the indictment would be a subject of concern. (See *U. S. v. Denmon,* 483 F.2d 1093 (8th Cir. 1973)).

"It is, of course, settled law that in order for an indictment to be valid it must allege all the elements which are necessary to constitute a violation of the statute. *But it is not necessary that the indictment follow the exact wording of the statute.*[7] (Emphasis added).

The test is whether the language used "plainly describes each element," (*Glenn v. U. S.*, 303 F.2d 536, 538 (5th Cir. 1962), cert. den. 372 U.S. 920, 83 S.Ct. 734, 9 L.Ed.2d 725) so that it apprises defendant of what he must be prepared to meet (*Rudin, supra*, at 48). In the words of one recognized commentator:

"The fundamental purpose of the pleading is to inform the defendant of the charge so that he may prepare his defense, and the test for sufficiency ought to be whether it is fair to defendant to require him to defend on the basis of the charge as stated in the particular indictment * * *. The stated requirement that every ingredient or essential element of the offense should be alleged must be read in the light of the fairness test just suggested. (*Wright, supra*, § 125, at 233–4; see also *U. S. v. Berlin, Richman and Denmon, supra*, in support of that basic test)."

The instant indictment fulfills that function. Rather than simply adverting to the statute, it virtually quotes the regulation which embodies the standard. In so doing, it alleges that the emission charged is traceable to a violation of the standard, more specifically, to a failure to wet and remove the material as a prelude to demolition.[8]

The indictment charges that defendant: " * * * did knowingly *cause the emission of asbestos* from a four and one-half story commercial masonry building at the aforementioned location *by failing to wet and remove friable asbestos* material, used to insulate and fireproof a boiler in the basement of said building, *before demolition* of the load-supporting structural supports *had begun * * * "* (Emphasis added).

The emission charged is directly attributable to the failure to wet and remove the asbestos prior to demolition. The indictment alleges that defendant caused the emission *by* failing to wet and remove "before demolition had begun." Use of the tense "had begun" indicates that demolition was commenced thereafter. Thus, the substance of the element is present, in some detail. Substitution of the more specific language of a regulation intended to define a statutory term, in the place of that term, is certainly adequate to apprise defendant of the charge and the nature of the cause against it. (*Russell, supra; U. S. v. Marra*, 481 F.2d 1196 (6th Cir. 1973).

In reaching its decision, this Court does not perceive any conflict with the analysis adopted by prior judicial determinations.[9] In the cases relied upon by defendant, the indictments not only failed to state the key statutory terminology, but also failed to correct the omission with other acceptable language. Thus, the courts felt confronted by the need to presume one essential element from allegations of another. Such a presumption is not required in the instant case, inasmuch as the element may be found within the four corners of the indictment. Accordingly, defendant's argument to the contrary must be rejected.

## B. *Insufficient Evidence.*

 Defendant argues that the indictment should be dismissed on the ground

---

**7.** See also *Dunbar v. U. S.*, 156 U.S. 185, 190, 15 S.Ct. 325, 39 L.Ed. 390 (1894); *U. S. v. Behrman*, 258 U.S. 280, 42 S.Ct. 303, 66 L.Ed. 619 (1921); *U. S. v. Richman*, 369 F.2d 465 (7th Cir. 1966); *U. S. v. Berlin*, 472 F.2d 1002 (2nd Cir. 1973).

**8.** Importantly for these purposes, the validity of the regulatory scheme is assumed. Therefore, the pertinent allegation is that the emission was in *violation* of the standard allegation

of a particular level or amount of emission is not required for purposes of this argument.

**9.** Similar challenges have been posed successfully in: *U. S. v. Nat. Wrecking Co.*, 74 CR 755 (N.D.Ill.1975); *U. S. v. Nardi Wrecking Co.*, 74 CR 756 (N.D.Ill.1975); *U. S. v. Harvey Wrecking Co.*, 74 CR 758 (N.D.Ill.1975); *U. S. v. Brandenberg Demolition Co.*, 74 CR 757 (N.D. Ill.1975), hereinafter "Illinois cases."

that the government has insufficient evidence to proceed to trial. In particular, it argues that since there has been a failure to promulgate an "emissions standard," there can be no evidence of a prohibited emission. In addition, it simply asserts a dearth of evidence. To the extent that the argument relies upon the validity of the regulation it will be considered separately. To the extent that it is premised upon insufficient evidence, it is devoid of merit. It is well-settled that presentation of incompetent, illegal, or insufficient evidence to the grand jury does not constitute grounds for dismissal of an indictment. (*Costello v. U. S.*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1955); *Lawn v. U. S.*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1957); *U. S. v. Blue*, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1965); *U. S. v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)). Nor does a claim that evidence sought to be used at trial is illegal suffice. *U. S. v. Blue, supra* ). It follows, then, that a defendant in a criminal case may not challenge an indictment on the ground that it is not supported by adequate evidence. *U. S. v. Birmingham*, 454 F.2d 706 (10th Cir. 1971), cert. den. sub nom. *Chiles v. U. S.*, 406 U.S. 969, 92 S.Ct. 2424, 32 L.Ed.2d 668; *U. S. v. Kysar*, 459 F.2d 422 (10th Cir. 1972)).

### C. *Failure to Specify Statutory Section.*

Defendant contends that the indictment does not specify a subsection of 42 U.S.C. § 1857c–7. However, Count I refers to the section with as much particularity as possible: It alleges a "violation of Title 42, United States Code, Section 1857c–7(c)(1)(B)." Therefore, defendant's argument is without merit.

### III.

In light of the inability of this Court to resolve defendant's motion on the foregoing contentions, it must address the remainder of its challenges to the indictment. The first inquiry, of course, is as to the jurisdiction of this Court to consider the balance of the claims.

Defendant's attack on Count I of the indictment is three-fold.[10] It argues:

1. That the indictment fails to allege the element of violation of an emission standard because 42 C.F.R. § 61.22(d) is not a viable standard within the meaning of the statute;

2. That the regulation (40 C.F.R. § 61.22(d)) is an illegal usurpation of the statutory authority to promulgate an emission standard under § 1857c–7; and

3. That the regulation is impermissibly vague.

The government contends that 42 U.S.C. § 1857h–5 deprives this Court of jurisdiction to adjudicate those claims. Section 1857h–5, provides, insofar as pertinent:

"(b)(1) A petition for review of action of the Administrator in promulgating * * any emission standard under section 1857c–7 of this title, * * * may be filed only in the United States Court of Appeals for the District of Columbia. * * * Any such petition shall be filed within thirty days from the date of such promulgation or approval, or after such date if such petition is based solely on grounds arising after such thirtieth day.

"(2) Action of the Administrator with respect to which review could have been obtained under paragraph one shall not be subject to judicial review in civil or criminal proceedings for enforcement."

Thus, a petition for review of "action of the Administrator in promulgating" an "emission standard" must be brought in the District of Columbia Circuit within thirty days of promulgation, or after that time if the challenge is asserted solely on new grounds. Subsection (2) forecloses later litigation in criminal enforcement proceedings,[11] of matters for which review could have been obtained under (b)(1). (See *Duquesne Light Co. v. Environmental Protection*

---

10. This Court fails to discern the relevance of these arguments, with the exception of vagueness, to Count II.

11. The instant proceedings seek criminal enforcement. See 42 U.S.C. § 1857c–7(c)(1).

*Agency*, 481 F.2d 1 (3rd Cir. 1973); *Granite City Steel Co. v. EPA*, 501 F.2d 925 (7th Cir. 1974); *Buckeye Power, Inc. v. EPA*, 481 F.2d 162 (6th Cir. 1973), for general elucidation of the statutory mechanics, in the context of review of state implementation plans).[12]

### A. Failure to Allege Violation of Emission Standard.

■ Defendant's first, and primary, challenge focuses on the term "emission standard," as employed in § 1857c–7. More specifically, defendant asserts that § 1857c–7(c)(1)(B) prohibits emission of asbestos in violation of an *emission standard*. Pursuant to Section 1857c–7(b)(1)(B), which authorizes the Administrator to prescribe such a standard, the EPA promulgated 40 C.F.R. § 61.22(d), which directs the wetting and removal of asbestos prior to demolition. Defendant argues that § 61.22(d) is not an "emission standard" as contemplated by the Act in that it does not quantify a permissible level of emissions. Therefore, defendant reasons the statutory offense of emission in violation of a standard has not been created and cannot be alleged. Thus, the indictment is incurably defective, and must be dismissed. Decision of that issue would necessitate examination of the text, operation, and history of the statute. This Court concludes that such a task has not been withdrawn from its jurisdiction.

■ In the first place, it is axiomatic that this Court retains jurisdiction to determine its own jurisdiction. Thus, even in a setting in which jurisdiction to decide substantive questions concerning agency action is apportioned among different courts, each court is entitled to decide the "jurisdictional facts," that is, those specifications which place an action properly in one court as opposed to another (Jaffe, *Judicial Control of Administrative Action*, 636 et seq. (1965)). In the instant case, the jurisdiction of the District of Columbia Circuit extends only to "action of the Administrator in promulgating * * * any emission standard * * * " (§ 1857h–5(b)(1)). If a regulation is not an emission standard, the statutory preclusion is inapplicable. Consequently, the question of whether § 61.22(d) constitutes an emission standard, as posited by defendant, is a jurisdictional fact which this Court is entitled to consider. If it is deemed a standard, that line of inquiry terminates. If, on the other hand, it is not a standard, then this Court may proceed to adjudicate defendant's two remaining challenges.

Secondly, the fact that this Court ordinarily has jurisdiction to hear claims of this type is beyond dispute. Equally apparent is the substantial prejudice defendant will suffer if denied an opportunity to raise its defenses to a criminal indictment.[13] Therefore, this Court cannot, in good conscience, assent to a withdrawal of its jurisdiction without a showing of " 'clear and convincing evidence' of a contrary legislative intent." (*Abbott Laboratories v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1966); *Jaffe, supra*, at 336–359; *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1970); *City of Chicago v. U. S.*, 396 U.S. 162, 164, 90 S.Ct. 309, 24

---

**12.** Under Section 1857c–5(a)(2), the Administrator of the EPA is required to approve (or reject) state plans. That approval is subject to judicial review under § 307, on terms identical to those covering promulgation of federal standards:

"A petition for review of an Administrator's action in approving or promulgating any implementation plan under 1857c–5 of this title * * * may be filed only in the United States Court of Appeals for the appropriate Circuit * * * "

Such petitions are similarly subject to the thirty-day time restriction. The only difference is in the designation of a reviewing court. Even the language is identical: § 307 refers to "action in promulgating federal emission standards"; and "action in approving or promulgating" state plans. Therefore, the conclusion that the claims which are not raised at the hearing do not constitute "action in approving" is equally applicable to the pertinent language here "action in promulgating." The difference between approval and promulgation is immaterial because the relevant aspect is what occurs during the agency action.

**13.** Defendant will have *no* legal recourse, since the thirty days from date of promulgation have long since elapsed.

L.Ed.2d 340 (1969); *Rosado v. Wyman*, 397 U.S. 397, 420, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1969)). That is, the statutory scheme must present a virtually unequivocal intent to reserve the very issues at bar to the District of Columbia Circuit. It is in that respect that the statute, and its case law progeny, are most noticeably deficient.

The threshold question, vigorously argued by the parties, is the manner in which defendant's claim should properly be characterized. Defendant views its argument strictly as a challenge to the indictment, which does not require the Court to "review * * * action in promulgating" and, therefore, does not invoke the strictures of § 1857h–5. The government formulates the challenge as one to regulation, which would be precluded by § 1857h–5. The Court need not decide the question,[14] since it finds that under either theory, its jurisdiction has not been clearly and convincingly withheld.

Were the Court to view the controversy solely as an attack on the sufficiency of the indictment, as defendant urges, it would clearly not be confronted with the problem of reviewing action in promulgating, as provided in § 1857h–5. Rather, its attention would be directed to scrutiny of the terms of the indictment, by standards developed specifically for that purpose. Therefore, the effect of § 1857h–5 would most certainly be avoided.

Alternatively, the Court may analyze the argument as presenting interwoven challenges to the indictment and regulation. That particular course acknowledges that in order to determine the validity of the indictment, there must be reference to the regulation. However, it also refuses to overlook the fact that defendant's challenge is, ultimately, one to the indictment. Such a view is adjusted to the precise nature of defendant's argument, which questions not only the vitality of the regulation within the statutory framework, but also the ability of the government to charge defendant with commission of a crime based on the regulation.[15]

Section 1857h–5, by its terms, evinces no definite intent to limit such challenges. It merely states that "actions of the Administrator in promulgating" shall be "reviewed" in the District of Columbia Circuit within thirty days. Furthermore, actions susceptible to District of Columbia Circuit review "shall not be subject to judicial review in * * * criminal proceedings for enforcement." The Act nowhere delimits "action in promulgating," "review," or "proceedings." Therefore, it is impossible to ascertain, with any degree of certainty, the operative scope of the statute. If, for instance, "proceedings" applies only to the trial, the section would only foreclose selected defenses on the merits as opposed to pretrial defenses. Importantly, the pretrial type of defense is generally legal in nature, in that it disputes the charge as a matter of law. Thus, it may, as defendant does, question the existence of the elements of an offense on the ground that they are legally infirm. Contrastingly, a defense on the merits is more often submitted to the trier of fact, and contests the existence of the elements of the crime in an evidentiary fashion. It may well have been the intent of Congress to restrict review only of trial-type defenses.[16] In fact, a review of the case law indicates that such factual ques-

---

**14.** However, defendant's characterization as a challenge to the indictment, if accepted, would effectively circumvent the statute.

**15.** In that sense, this argument is critically different from *Dore Wrecking Co. v. Fri*, 73–1686 (D.C.Cir. 1973), which the government contends decided the issue at bar. Assuming for the sake of argument, that to be the case, the challenge was not to the indictment and * * * did not ask the court to gauge the regulation in that manner.

**16.** For example, see *Buckeye Power, supra*, wherein a defense of impossibility was raised. Although the court permitted defendant to assert it, the case exemplifies the *type* of challenge which the statute would preclude, under appropriate circumstances. A defendant could claim, for instance, that a regulation is not feasible. Therefore, it would argue, it could not comply with it. Such a defense would be presented to the trier of fact at trial. It is not strictly legal in nature. However, 1857h–5 might well preclude it as requiring review of action in promulgating.

tions are indeed the kind of challenges which Congress consciously sought to restrict.[17]

Furthermore, defendant's claim involves scrutiny not only of what might arguably be considered "action in promulgating an emission standard," [18] but also of the indictment. It not only entails application of a standard of review which might be available to the District of Columbia Circuit,[19] but also one which clearly was not. Defendant was not charged with violation of the statute until well after the thirty-day time period had elapsed. Therefore, the type of review it now seeks, an analysis to determine whether the regulation constitutes a crime, was not obtainable in the District of Columbia Circuit, and remains open to this Court (*Granite City Steel Co. v. EPA*, 501 F.2d 925, 928 (7th Cir. 1974)). Thus, viewing defendant's claim as intermingling challenges to the indictment and regulation necessitates the conclusion, in light of the undefined statutory ambit, that this Court must retain jurisdiction.

However, even were this Court to adopt the government's view that the defendant presents only a challenge to the regulation, it does not find sufficient indication in § 1857h–5 to preclude its consideration of the claim. According to the government's hypothesis, the proper analysis requires isolation of defendant's challenge to the regulation from its challenge to the indictment. Thus, it urges consideration only of defendant's argument that § 61.22(d) is not a standard within the meaning of § 1857c–7, in determining whether the jurisdictional limits of § 1857h–5 pertain. The government asserts that the defendant's "no standard" argument involves review of the Administrator's action in promulgating 40 C.F.R. § 61.22(d), as identified by § 1857h–5. Therefore, it concludes that this Court lacks jurisdiction to entertain the argument, despite the fact that it is raised in the context of the sufficiency of the indictment.

This Court has attempted, without success, to define the scope of § 1857h–5. The statute, by its terms, restricts review in the District of Columbia Circuit to "action of the Administrator in promulgating * * any emission standard under Section 1857c–7 of this title." Yet, nowhere does the statute or legislative history outline the meaning of "action in promulgating." The term itself connotes procedural action, although cases have, without explanation of the question, simply *assumed* review of substantive decisions of the agency.[20] If Congress intended only that agency procedures be reviewed within thirty days, the instant claim may clearly proceed.

In addition, "action in promulgating" appears to be distinct from, and precedent to, the promulgated regulations.[21] Yet there are no articulated guidelines which the Court may use to employ the distinction. Thus, in the instant case, it is difficult to understand whether defendant's initial challenge to the regulation, which does not directly attack the efficacy of the Administrator's action,[22] should be deemed a challenge to "action in promulgating." It is more nearly an attack on the "promulgated regulation," which requires the Court to evaluate that regulation in light of the statutory scheme.

Furthermore, there is no elucidation of the scope of "review" envisioned by § 1857h–5, which provides, *inter alia:*

---

**17.** See discussion, infra.

**18.** Although in the opinion of this Court, it does not.

**19.** That position is tenuous at best. See discussion, infra.

**20.** See, e. g., *Granite City Steel, supra; Commonwealth of Pa. v. EPA,* 500 F.2d 246 (3rd Cir. 1974) for review of substantive considerations; *Appalachian Power Co. v. EPA,* 477 F.2d

495 (4th Cir. 1973) for review of hearing procedures.

**21.** It is instructive to note that the Senate version of the Bill was geared to review of "the promulgated regulation." Senate Bill was 4350, Sec. 308, at 116 Cong.Rec. 15807 (Sept. 17, 1970).

**22.** As does, for instance, defendant's next argument dealing with the scope of the Administrator's authority.

"(b)(1) A petition for review * * * may be filed only in the District of Columbia Circuit * * * "

Subsection (b)(2) continues:

"Action of the Administrator with respect to which *review could have been obtained* under paragraph one shall not be subject to judicial review in civil or criminal proceedings for enforcement." (Emphasis added).

Thus, only the type of review available in the District of Columbia Circuit is now foreclosed to defendant. The critical question is whether the review sought herein could have been obtained under (b)(1). Specifically, the Court must define the applicable scope of review under § 1857h–5. If the District of Columbia Circuit inquiry is restricted to questions other than those at bar, then defendant was never afforded an opportunity for judicial review. Consequently, it may seek that review in the instant proceeding. (*Granite City Steel Co. v. EPA, supra,* at 928).

Unhappily, the statute fails to set forth the standard of review which the District of Columbia Circuit is to utilize. A review of case authority not only illustrates, but compounds the problems generated by statutory omission.[23] In the absence of statutory direction as to the scope of review, courts have looked to *Citizens to Preserve Overton Park v. Volpe, supra.* (See, e. g. *State of Texas v. EPA,* 499 F.2d 289, 296 (5th Cir. 1974); *Appalachian Power, supra,* at 505).

In *Overton Park,* the Supreme Court was confronted with a claim that the Secretary of Transportation had violated statutes which permitted authorization of federal funds to finance highway construction through public parks if a "feasible and prudent" alternative route did not exist, in which case he was directed to engage in "all possible planning to minimize harm." The petitioners challenged the construction of a highway, asserting that feasible and prudent routes did in fact exist, and that the plan did not, in any event, minimize harm. In the absence of statutory statement on the scope of review, the Court turned to § 706 of the APA, which provides that "a reviewing court shall * * * hold unlawful and set aside agency action, findings, and conclusions found not to meet six separate standards," (401 U.S. at 413, 91 S.Ct. at 822) namely:

"To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

* * * * * *

"(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

"(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

"(B) contrary to constitutional right, power, privilege, or immunity;

"(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

"(D) without observance of procedure required by law;

"(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

"(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."

The Court continued:

"In all cases, agency action must be set aside if the action was 'arbitrary and capricious' * * * or if the action failed to meet statutory, procedural, or constitutional requirement. 5 U.S.C. § 706(2)(A), (B), (C), (D). (at 414, 91 S.Ct. at 822). * * * In certain narrow, specifically limited situations, the agency ac-

---

**23.** The discussion which follows is not intended to delineate what this court sees as the proper scope of review. Rather, it is intended to highlight the confusion attendant upon the operation of § 1857h–5. It is that confusion which this court finds determinative, in light of the fact that jurisdiction must be clearly and convincingly withdrawn.

tion is to be set aside if the action was not supported by 'substantial evidence.' "And, in other equally narrow circumstances, the reviewing court is to engage in a *de novo* review * * * 5 U.S.C. § 706(2)(E)(F) * * *

\* \* \* \* \* \*

"Review under the substantial evidence test is authorized only when the agency action is taken pursuant to a rule-making provision of the APA itself, 5 U.S.C. § 553. (at 414, 91 S.Ct. at 822).

\* \* \* \* \* \*

"*De novo* review * * * is authorized when the action is adjudicatory in nature * * * (or) when issues were not before the agency" (at 415, 91 S.Ct. at 823). Concluding that there was no exercise of a rule-making function and that de novo review was unwarranted, the Court proceeded to consider three of the remaining standards:

" * * * the generally applicable standards of § 706 require the reviewing court to engage in a substantial inquiry * * *

"The court is first required to decide whether the Secretary acted within the scope of his authority * * *
"Section 706(2)(A) requires a finding that the actual choice made was not arbitrary * * *. The final inquiry is whether the Secretary's action followed the necessary procedural requirements." (415–17, 91 S.Ct. at 823).
Thus, the Court surveyed the entire spectrum of potential standards of review, eliminated those which were inapposite, and applied the remainder, that is, the latter three, i. e., scope of authority, arbitrary and capricious, and procedure.

Some courts have adverted to the three *Overton* standards of review within the context of the Clean Air Act and, specifically, § 1857h–5. (*State of Texas, supra,* at 296; *Appalachian Power Co., supra,* at 505). However, their analyses are not altogether helpful. In the first place, the statute in Overton Park, unlike the statute at bar, does not provide a bifurcated system of review. Therefore, the *Overton* approach offers only analogous guidance as to the proper scope of review when one form of review is temporarily restricted, and the other consists of criminal enforcement. Secondly, the Court in *Overton Park* did *not* decide, as courts seem to have subsequently presumed, that only three types of review are available when a statute is silent on the subject. Rather, *Overton* simply scanned the panoply of review and selected the three it found appropriate to the case then under consideration. For instance, *Overton Park* explicitly stated that unconstitutionality was a potential standard, but did not discuss it further because the claim did not so require.

The confusion is exacerbated when comparing the analyses on standards of review of *State of Texas, Appalachian Power, Buckeye Power,* and *Getty Oil* with *Delaware Citizens for Clean Air v. EPA,* 480 F.2d 972, 975–6 (3rd Cir. 1973); *Commonwealth of Pa. v. EPA,* 500 F.2d 246, 250 (3rd Cir. 1974); *Friends of Earth v. USEPA,* 499 F.2d 1118, 1123 (2nd Cir. 1974); *Nat. Res. Def. C. v. EPA,* 478 F.2d 875, 881 (1st Cir. 1973); *Buckeye Power, supra,* at 171.

Thus, the only definite conclusion which this Court can draw from an analysis of the case law is that the operative scope of the statute is undefined. The language itself provides no guidance; the ensuing case law reflects and intensifies, rather than clarifies, the statutory ambiguity. That portion of the precedent which indicates that review in the District of Columbia Circuit is limited to the question of whether the agency action is "arbitrary and capricious" would tend to support this Court's jurisdiction. However, even if this Court were to ignore those decisions, it would be persuaded by the great uncertainty and inconsistency resulting from judicial attempts to define § 1857h–5 that Congress has not evinced a clear purpose to bar the instant judicial review.

Furthermore, Congress has not clearly and convincingly withdrawn jurisdiction of the type of issue here presented. Defendant's argument questions the *existence* of a

viable regulation; it seeks a determination that the regulation in question does not comply with the legal requirements envisioned by Congress and embodied by the Act. That type of inquiry is quite different from that engaged in by the courts under § 1857h–5, as illustrated by several of the cases cited by the government. In *Getty Oil Co. v. Ruckelshaus,* 467 F.2d 349 (3rd Cir. 1972), plaintiff challenged a regulation as unnecessary because the national primary standard had been met, and as burdensome in that it imposed undue economic hardship. In *Granite City Steel, supra,* the regulation was challenged on the ground that it contained an unreasonable attainment date.[24] Thus, the challenges in the cases relied upon by the government have questioned the judgmental aspects of the Administrator's decisions: the feasibility, cost, or adequacy of a given regulation,[25] or in other terms, those courts were asked to assess the wisdom, rather than the legality of regulations.[26] The inquiry was, therefore, into areas of agency discretion and expertise on the subject of pollution. In contrast, the question at bar, which concerns the legal definition of "standard," may not be classified as requiring a judgment peculiarly within the agency's competence. It is fundamentally legislative and judicial in nature, does not involve the agency's expertise, and does not require merely an exercise of administrative discretion. Therefore, it does not appear to be the type of issue which Congress reserved to the District of Columbia Circuit.

That conclusion finds support in both the judicial and legislative arenas. Courts, although in disagreement in the apposite standards of review, have been unanimous in defining their role in the application of those standards:[27]

24. For treatment of similar issues see *Delaware Citizens for Clean Air v. USEPA,* 480 F.2d 972 (3rd Cir. 1972), (adequacy of plan to attain proper level); *International Harvester Co. v. Ruckelshaus,* 155 U.S.App.D.C. 411, 478 F.2d 615 (1973) (availability of technology); *State of Texas, supra* (cost factors, wisdom of methods); *Friends of Earth v. USEPA,* 499 F.2d 1118 (2nd Cir. 1974) (impact of mass transit and parking); *Duquesne Light Co., supra* (reasonableness of plan); *Commonwealth of Pa. v. EPA, supra* (whether air bleed retrofit program is practicable method for achieving standard); *Nat. Res. Def. Co., Inc. v. USEPA,* 483 F.2d 690 (8th Cir. 1973) (degree of intergovernmental cooperation required); *Portland Cement Assoc. v. Ruckelshaus,* 158 U.S.App.D.C. 308, 486 F.2d 375 (1973) (cost, achievability; *Essex Chemical Corp. v. Ruckelshaus,* 158 U.S.App.D.C. 360, 486 F.2d 427 (1973) (achievability, adequate demonstration of standard).

The bulk of the remainder of cases deal with review of ministerial or procedural aspects of agency action. The only case which more closely approximates the one at bar is *Nat. Res. Def. Co., Inc. v. EPA,* 489 F.2d 390 (5th Cir. 1974) rev'd 43 LW 4467. One of the issues in that case was the meaning of the language in § 1857c–5(a)(2)(B). The court, on a petition under § 1857h–5, found, after review of pertinent statutory sections, that "emission limitations and such other measures as may be necessary" meant that standards should be promulgated unless impracticable. The ultimate question there, however, was the impact of the phrase "as may be necessary." Thus, the court was actually defining one of the areas of agency expertise explicitly incorporated into the statute.

25. For example, in the instant case, such an inquiry would scrutinize whether the regulation provides "an ample margin of safety" under § 1857c–7.

26. The government offers *Dore Wrecking Co. v. Fri,* 73–1686 (D.C.Cir.1973), for the proposition that the instant issue is within the jurisdiction of the District of Columbia Circuit. In that case, petitioner Dore filed a motion for stay pending review arguing that the regulation in question exceeded the Administrator's authority, which was dismissed as moot. Respondent's motion to dismiss the petition for review was granted, the court noting that there was "No exigent circumstances * * * excusing petitioner's failure to file a timely petition for review." Aside from the cryptic nature of the order, which casts some doubt on the precise holding and its precedential value, the issue is distinguishable in that it challenged the authority of the Administrator. This Court is not reaching that issue, basing its conclusion instead on defendant's "no standard" theory. Thus, the instant issue does not involve scrutiny of the Administrator's action according to a standard suggested in *Overton Park, supra.*

27. Thus, for instance, if a court is asked to decide whether a certain regulation is within the authority of the Administrator to promulgate "achievable systems (see *Essex Chemical, supra* ), it is basically engaging in a factor analysis of the reasonableness of the regulation, akin to the "arbitrary and capricious" standard

"In subjecting the Administrator's actions to judicial review, we apply a test of reasonableness, wherein *we are not empowered to substitute (our) judgment for that of the agency.*" (Emphasis added). (*Essex Chemical, supra,* 158 U.S.App.D.C. at 486 F.2d at 431. See also *Portland Cement, supra,* 158 U.S.App.D.C. at 335, 486 F.2d at 402; *Friends of Earth, supra,* at 1123; *Del. Cit. for Cl. A., supra,* at 976. Review which simply tests the reasonableness of the agency's action and accords it a high degree of deference is clearly appropriate to judge the wisdom of a regulation. It is not, however, effective in analyzing issues such as the one at bar. Thus, it is fair to conclude that the operation of § 1857h–5, as reflected in the review methodology of the Circuit Court, is tailored to questions involving the expertise and discretion of the agency.[28]

In addition, there is no definitive legislative pronouncement which clarifies the scope of § 1857h–5. This Court has searched the history of the statute for such indicators without success. The paucity of explicit congressional elaboration, in combination with the observation that the vast preponderance of the challenges under § 1857h–5 have been to the wisdom of the regulation, underscores the failure of Congress to consider the possibility of issues such as the one at bar. Congressional failure to define the term "emission standard" further evidences the lack of conscious consideration afforded the instant issue.[29] Simply, Congress, in enacting the section, contemplated only the questions exemplified by *Getty Oil* and *Granite City Steel*; it did not anticipate problems such as those

involved in *defining* "emission standard." Therefore, Congress, cognizant only of former types of litigation, quite sensibly restricted access to the courts on those issues. It did not, however, explicitly preclude review of the issue at bar.

An examination of § 1857h–5 to determine whether it preempts defendant's challenge has convinced this Court that its scope is, at best, highly ambiguous.[30] In view of the lack of clarity which reflects the Congressional failure to explicitly incorporate the instant issue within the ambit of § 1857h–5, this Court is compelled to conclude that the present claim has not been clearly and convincingly removed from its jurisdiction. Accordingly, this Court will retain jurisdiction over defendant's contention that 40 C.F.R. § 61.22(d) is not a standard, and will proceed to the merits of that argument.

## IV.

Defendant, Adamo Wrecking Company, is charged in an indictment with violating 42 U.S.C. § 1857c–7, which provides, inter alia:

"(c)(1) after the effective date of any emission standard under this section—

\* \* \* \* \* \*

"(B) *no air pollutant* to which such standard applies *may be emitted* from any stationary source *in violation of such standard* \* \* \*" (Emphasis added). Thus, the crime consists of a prohibited emission of asbestos, in violation of an emission standard.

Section 1857c–7(b)(1)(B) authorizes the promulgation of an emission standard:

---

of review. Its task is limited by the nature of "achievability" as involving expertise and discretion. It then makes little difference which rubric a court selects to characterize its review; the fact remains that the type of review utilized for appraising the wisdom of a regulation does not approximate the review sought by defendant herein.

**28.** Thus, even were the court to adopt the full range of review suggested in *Overton Park, supra,* it would not eliminate the instant case from its jurisdiction, since those standards of

review have not been geared to the instant type of inquiry.

**29.** Thus, although the legislative history is replete with reference to control of pollution, it nowhere explains the exact mechanism for control. See 3 U.S. Code Cong. & Admin. News, p. 5356 (91st Cong. 21 Sess. 1970).

**30.** This court is aware of its responsibility to interpret the statute, but it is unable to do so with any degree of ease. Therefore, it chooses to resolve doubts in favor of jurisdiction.

"(b)(1)(B) * * * the Administrator shall prescribe an *emission standard* for such pollutant * * * "

Pursuant to that mandate, the Administrator promulgated the regulation codified in 40 C.F.R. § 61.22(d), subdivision (2)(i) of which specifically provides:

"Friable asbestos materials, used to insulate or fireproof any boiler, pipe, or load-supporting structural member, shall be wetted and removed from any building * * * before wrecking of a load-supporting structural member is commenced."

█ The indictment alleges emission in violation of the regulation, by alleging that defendant "did knowingly cause the emission of asbestos * * * by failing to wet and remove * * * asbestos material * * * before demolition had begun." Defendant contests the sufficiency of both counts of the indictment, contending that it fails to charge an essential element of the offense, to-wit: an emission in *violation of a standard.* More specifically, defendant argues that the allegation in the indictment charging defendant with a failure to wet and remove asbestos, though a paraphrase of the promulgated regulation, fails to state that defendant violated a standard because the regulation is not a "standard" within the contemplation of the Act. An "emission standard," defendant argues, must establish a set, measurable level of emission. Since the instant regulation merely prescribes a methodology for emission control, namely, the "wet and remove" procedure, it is not a "standard," and cannot furnish the basis upon which to allege violation of a standard. Thus, it is asserted, the indictment is incurably defective, and must fall.

Careful consideration of defendant's argument prompts this Court to adopt its analysis.[31] The regulation provides a procedure for the reduction of emissions; it requires that "friable asbestos materials" be "wetted and removed" prior to demolition. A review of the administrative history reveals that the Administrator published a proposed emission standard for asbestos, which prohibited visible emissions (36 FR 23931). In response to criticism of that proposal, and with the awareness of the difficulty of measuring airborne asbestos,[32] the EPA promulgated what it classifies as a "work practice":

"The proposed standard would have prohibited visible emissions of asbestos * *. Comments indicated that the no visible emissions requirement would prohibit repair and demolition in many situations * * *. Accordingly, the promulgated standard specifies certain *work practices* which must be followed when demolishing certain buildings and structures." (38 FR 8821 (1973)).[33]

The question before this Court, then, is whether the statutory term "emissions standard" is intended to encompass a "work practice," or whether it refers only to specification of a *level* of emission. The statute, unhappily, does not define the term. However, a review of the legislation convinces this Court that the narrower construction must prevail.

The plain meaning of the words, which the Court should not overlook (*Bouie v. City of Columbia,* 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964)) connotes a rate or quantity,[34] and at least several courts have been of that opinion.[35] In addition, § 1857c–

---

**31.** However, this court discerns it as a challenge only to Count I, and can see no bearing on Count II.

**32.** 38 FR 8821 et seq.; see also *Background Information on the Development of National Emissions, Standards for Hazardous Air Pollutants,* pp. 23–35.

**33.** See also letter from Russell Train to Gerald Ford, of March 22, 1974.

**34.** In fact, a study prepared with the support of the National Science Foundation concerning automotive emission standards states: "Emission standards specify the maximum legally permissible flow rates of certain pollutants from the emission source into the air."

**35.** In the Illinois cases, cited in footnote 9, supra, the courts indicated that they felt that § 61.22(d) was not a standard. The government's assertions to the contrary ignore the conclusions of Judge Decker, in *National*

7(b)(1)(B) directs that the "Administrator shall prescribe an emission standard * * * *at the level* at which in his judgment provides an ample margin of safety." (Emphasis supplied). Thus, the implication that a standard is to specify a level is unmistakable. It is reinforced by reference to a description in the legislative history which says: " * * * *emission levels* must provide an ample margin of safety to assure public health protection" (3 U.S. Code Cong. & Admin. News, p. 5379, (Emphasis supplied)). The necessity for a level is also contemplated by § 1857c–6 which defines a "standard of performance" as:

"a *standard for emissions* * * * which *reflects the degree of emission limitation* achievable through the application of the best system of emission reduction * * * which the Administrator determines has been adequately demonstrated." (Emphasis added).

A "standard of performance" is an emission standard which reflects a feasible degree of limitation. Thus, it is clear that one type of emission standard must express a degree of limitation, that is, a measurable level. Importantly, § 1857c–6 does not require a standard of performance to *reflect the best system demonstrated*, but to reflect *the degree of limitation* which that system permits. A review of the standards promulgated pursuant to § 1857c–7 confirms that interpretation. (40 C.F.R. § 60.1 et seq.).

Furthermore, the high degree of identity between a "standard of performance" (§ 1857c–6) and an "emission standard" (§ 1857c–7), suggests that both must be expressed in terms of levels. An emission standard generally applies to ultra-hazardous pollutants from new or existing sources, whereas a standard of performance applies to new stationary sources. However, under § 1857c–6(d)(1) an "emission standard" is to be promulgated for existing sources which would require a "standard of performance"

---

if new. The sources are identical; the only difference is their age. Therefore, the two types of regulations are also intended to be identical, in the manner in which they specify control. The identity is also indicated in the legislative history, which explains that emission standards are to be developed in both instances:

"The legislation, therefore, grants authority * * * to establish *emission standards* for any (new or ultra-hazardous) sources * * * which constitute new sources of substantially increased pollution." (3 U.S. Code Cong. & Admin. News, p. 5361, 91st Cong. 2d Sess. 1970).

Thus, it appears that an "emission standard," like a "standard of performance" must reflect a level of emission.

Furthermore, the intent to require a level is apparent from the development of the Act. The Senate version completely prohibited emissions of hazardous pollutants, unless the Administrator could determine that limited amounts of such pollutants did not present a danger,[36] in which case he was directed to promulgate an "emission standard." The provision was explained as follows:

"The Secretary establishes emission controls through the publication of proposed prohibitions * * * and promulgates such prohibitions unless he determines that a departure from a zero emission * * * will not jeopardize health * * * whereupon he promulgates an *emission standard prescribing the permissible level of emission for such pollution agents.*" (116 Cong.Rec. 16256). (Emphasis added).

Thus, it is clear that from the inception of the Act, the term "emission standard" was intended to connote a level of emission.

In addition, since both emission standards and standards of performance are means of "reflecting degree of emission limitation,"

---

*Wrecking* at pp. 3 and 4, wherein he states: "The Administrator promulgated methods of control *without specifying emission standards* * * *." Similarly, Judge Bauer, in *Harvey Wrecking*, supports that conclusion at p. 4 of that opinion.

36. See S. Bill 4358, Sec. 115, at 116 Cong. Rec. 15000 (Sept. 17, 1970), and explanation at 3 U.S. Code Cong. & Admin. News, p. 5378.

an emission standard is a type of emission limitation. The Supreme Court describes an emission limitation as:

"regulation(s) of the composition of substances emitted into the ambient air from such sources * * *." (*Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 78, 95 S.Ct. 1470, 1481, 43 L.Ed.2d 731 (1975)).

In a letter of March 22, 1974, the Administrator of the EPA, Russell Train, suggested, with direct reference to the regulation in issue, that "emission limitation" does indeed refer to quantification:

"We are requesting Congressional affirmation of our authority to set design, equipment, or practice standards under those sections where the limitations of measurement technology make an *emission limitation* approach infeasible or impractical."

That is an obvious acknowledgment that the disputed regulation does not follow the emission limitation approach because it is unfeasible to promulgate a numerical standard. *Nat. Res. Def. Council, Inc. v. EPA*, 489 F.2d 390 (8th Cir. 1974), rev'd other grounds, 43 LW 4467, equates "emission limitation" with "emission standard." There, the court considered the meaning of § 1857c–5(a)(2)(B), which requires "emission limitations and such other measures as may be necessary." The court concluded that § 1857c–5(a)(2)(B) required *emission standards* unless such standards are unfeasible.[37] Thus, the conclusion that an emission limitation, of which a standard is a subcategory, requires a level is not unreasonable. The EPA has admitted that it has proven impracticable to follow the emission limitation approach. This is tantamount to an admission that the mandate of the statute was not followed.

Furthermore, § 1857c–5(a)(2)(B) is instructive in that it illustrates an instance in which Congress, intending to provide for options other than emission standards, in exigent circumstances, did so explicitly. The negative inference as applied to § 1857c–7 is certainly proper.

Support for this Court's construction of "emission standard" may be found in other sections of the Act. Thus, § 1857c–4 directs promulgation of "national primary and secondary ambient air quality standards." Section 1857c–4(b)(1) provides:

"National primary * * * standards * * * shall be ambient air quality standards * * * allowing an adequate margin of public health."

The language is highly reminiscent of § 1857c–7: all standards promulgated thereunder contain levels. (See 40 C.F.R. 50.4, 50.6, 50.8, 50.9, 50.10, 50.11).[38]

Similarly, § 1857c–4(b)(2) requires that national secondary standards "shall specify a *level* of air quality." The regulations do so specify (40 C.F.R. 50.5, 50.7). Emission standards for moving sources, under § 1857f–1, must also specify a level which requires "a reduction of at least 90% per centum from emissions * * *." All promulgated regulations under that section also contain levels. (40 C.F.R. 85.1 et seq.).

Finally, the statutory pattern appears to approach the problem of emissions via two avenues: measurable standards, and procedures for implementing them. Each approach is distinct. In § 1857c–7, in addition to prescribing a standard, the Administrator must also issue "information on pollution control techniques." (§ 1857c–7(b)(2)). The President may exempt a source "if he finds that the technology to implement such standards is not available." Section 1857c–

---

**37.** See also EPA Staff Paper, 119 Cong.Rec. 10955–56 to the same effect.

**38.** The government contended, on oral argument, that an ambient air standard differed from an emission standard in that the latter measures airborne concentrations while the former is directed to the source. It suggested that an emission standard included all types of controls applied to the source. That distinction is not consistent with the statutory language or history, and cannot be accepted. The more logical interpretation is that ambient standards refer to acceptable levels generally, whereas emission standards designated by source refer to acceptable levels of emission for each source.

6(b)(1)(B)(3) directs publication of information on control techniques for sources subject to standards of performance. Under Section 1857c–6(d)(1), the Administrator "establishes emission standards," *and* "provides for the implementation" thereof. Under § 1857f–1(b)(1)(B)(4), the Administrator is to report to Congress "with respect to the development of systems necessary to implement the emission standards established pursuant to this section." Thus, Congress was clearly separating standards from methods of control. That separation supports the conclusion that the instant regulation is not a standard.

Importantly, there appear to be no persuasive arguments in support of the government's position. It claims that the regulation is an emission standard because, emissions from asbestos are harmful, measurement of such emissions is impractical, and therefore a work practice is in order. (See 38 FR 8820, (April 6, 1973); *Background Information, supra*).

It buttresses that argument [39] with reference to 42 U.S.C. § 1857(b)(1) which announces that the purpose of the Act is to "protect and enhance the quality of the Nation's air * * *;" and to 42 U.S.C. § 1857g(a) which provides:

"The Administrator is authorized to prescribe such regulations as are necessary to carry out his functions under this chapter."

The government argues that the general purpose of the Act as well as the broad power delegated to the Administrator justify an expansive reading of the term "emission standard." This Court finds the contentions to be untenable. Congress did indeed propose to protect the environment. However, it chose to effectuate its purpose by means of standards which set permissible levels of emission. Furthermore, acceptance of the suggested impact of § 1857g(a) upon promulgation of a standard would effectively bypass the parameters set forth by Congress by affording the agency an opportunity to redefine them.[40]

Thus, the government's argument essentially asks this Court to uphold § 61.22(d) because it has found that asbestos is harmful and not easily susceptible to measurement. While this Court is fully convinced that the Administrator has appropriately characterized asbestos emissions, it cannot allow subsequently discovered exigencies to modify the statutory framework. There is absolutely no indication that Congress knew or anticipated the type of problem which prompted promulgation of the work practice.[41] Nor is there any statutory language or history to support a broad interpretation.[42] Therefore, the proper corrective is an amendment to the Act.[43]

The government seeks to reinforce its position by application of two principles of construction: deference to agency interpretation and liberal construction of criminal regulatory statutes. Specifically, the government asks this Court to defer to the EPA interpretation of emission standard,[44] and to accord the term a "liberal" construc-

---

**39.** The government relies also upon *Dore Wrecking v. Fri, supra*. However, the holding there *appears* to be only that, "there being no exigent circumstances presented in the case excusing petitioner's failure to file a timely petition for review."

**40.** Therefore, this Court concludes that § 1857g refers to auxiliary regulations, and does not authorize expansion of existing guidelines. Accordingly, § 61.22(d) may be duly authorized, but it is not a standard.

**41.** Those findings first appear in the Administrative hearings.

**42.** All such evidence is to the contrary.

**43.** Importantly, such an amendment has been suggested. 42 U.S.C. § 1857c–7(b)(1)(B) would read: "If the Administrator determines that technological or economic limitations on application of measurement methodology to particular class of sources would make the imposition of emission standard infeasible, he may instead prescribe a design or equipment standard * * *." The amendment is requested by the EPA.

**44.** The government cites *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Northway Lanes v. Hackley Union Nat. Bank & Trust Co.*, 464 F.2d 855 (6th Cir. 1972).

**1074**

tion.[45] This Court cannot, however, abide by either principle.

Deference to this administrative interpretation would require the Court to accede to the view that "standard" incorporates "work practice" simply because the EPA says it does. In attempting to substitute its judgment for that of Congress, it is asking the Court to do by indirection what the Court has declined to do forthrightly.[46]

■■■ Further, an agency interpretation is not deserving of automatic deference; it must be reasonable, supportable and consistent.[47] Otherwise, deference becomes obedience to administrative fiat.

Finally, the cases cited by the government are distinguishable from the one at bar in two important particulars. First, none are in a criminal setting. Therefore, none can be said to stand for the proposition that an agency definition of an element of a crime is to receive deference. Such definitions are manifestly judicial in nature; agencies have no special expertise in the area which would require deference. Secondly, none deal with a statute in which the agency interpretation, in effect, defines its own authority to act. Deference to an agency in that area would encourage and shield enlargement of agency functions beyond their statutory scope. Therefore, the principle of deference is not compelling.

With regard to plaintiff's argument for a liberal construction of the term "emission standard," to include "work practice" the Court is equally unimpressed. In the first place, this Court remains skeptical of plaintiff's assertion that a "liberal construction" is appropriate.[48] However, even assuming its applicability for the sake of argument, it would be tantamount to ignoring the Con-

gressional intent in favor of the agency viewpoint. Such a result is clearly not required by the policies of liberal construction.

■■■ Furthermore, even a liberal statutory construction must be within the parameters envisioned by Congress and dictated by common sense. As the Supreme Court opined in *Kordel v. U. S.*, 335 U.S. 345, 349, 69 S.Ct. 106, 109, 93 L.Ed. 52 (1948):

> "A criminal law is not to be read expansively to include what is not plainly embraced within the language of the statute * * *. But there is no canon against using common sense in reading a criminal law, so that strained and technical constructions do not defeat its purpose by creating exceptions from or loopholes to it."

Since the rule of reasonableness must always temper statutory construction, this Court cannot permit expansion of the term "emission standard" beyond its statutory and sensible meaning. The statute seeks to control pollution *by means of emission standards.* As one court has explained:

> "* * * we find that * * * Congress intended * * * to require maximum use of emission standards. Some sections show a general preference on the part of Congress for emission standards; * * *.

The sections exhibiting Congress' preference for emission standards are sections 1857c–6(a)(1) and 1857c–7(b)(1)(B). Those sections provide, respectively, for the establishment of federal emission standards for new sources (section 1857c–6(a)(1)) and for emission of hazardous air

---

**45.** The government cites *U. S. v. Kordel*, 164 F.2d 913 (7th Cir. 1947), aff'd, 335 U.S. 345, 69 S.Ct. 106, 93 L.Ed. 52 (1948).

**46.** In the context of delegation of authority, such a result would be contrary to prevailing concepts. It is Congress which defines the contours of agency action; the agency merely supplies the details. See, e. g. *U. S. v. Shreveport Grain & Elevator*, 287 U.S. 77, 53 S.Ct. 42, 77 L.Ed. 175 (1932); *Kent v. Dulles*, 357 U.S. 116, 128, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1957);

*Yakus v. U. S.*, 321 U.S. 414, 423, 426, 64 S.Ct. 660, 88 L.Ed. 834.

**47.** In the instant case, even the Administrator's pronouncements have been consistent. See his letters of March 22, 1974, February 3, 1975, 38 FR 8820.

**48.** Since delegations of legislative authority are generally limited in scope (see footnote 46), it would be wise to construe them narrowly.

pollutants (section 1857c–7(b)(1)(B)). Both sections make clear that the Administrator is to establish *emission standards*; they do not contemplate control of pollution from new sources or of hazardous pollutants by dispersion techniques, or by any other techniques besides emission limitation." (*Natural Resources Def. Council, Inc. v. EPA*, 489 F.2d 390, 408–9 (5th Cir. 1974), emphasis in the original, reversed on other grounds, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731; See also *EPA Staff Paper, supra,* 119 Cong.Rec. at 10955 (daily ed. June 12, 1973).

It is clear, then, that the statutory approach to pollution control requires an emission standard. That requirement cannot be altered by general consideration of statutory objectives and practical obstacles. This Court is persuaded, in that regard, by the reflections of the Supreme Court in *U. S. v. Standard Oil Co.*, 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1965):

> "This case comes to us at a time in the Nation's history when there is greater concern than ever over pollution— * * *. The crisis that we face in this respect would not, of course, warrant us in manufacturing offenses where Congress has not acted or in stretching statutory language in a criminal field to meet strange conditions."

Accordingly, the Court finds, on the basis of defendant's first argument, that Count I of the indictment must be dismissed.

### V.

Defendant is charged in Count II of the indictment with knowingly making a false statement, to wit: a representation that a building did not contain friable asbestos, when it did; in violation of 42 U.S.C. § 1857c–8(c)(2) and 40 C.F.R. § 61.22(d)(1). Those sections provide, insofar as pertinent:

> "Any person who knowingly makes any false statement in any * * * document filed or required to be maintained under this chapter, shall upon conviction be punished * * *."

40 C.F.R. § 61.22(d) requires:

> "Any owner or operator * * * who intends to demolish any * * * build-

ing * * * which contains * * * friable asbestos shall comply with the requirements set forth in this paragraph.

> (1) Written notice of intention to demolish shall be provided * * *. Such notice shall include the following information:

>> (i) name of owner or operator.

>> (ii) address of owner or operator.

>> (iii) description of the building, * *.

>> (iv) address of building * * *.

>> (v) scheduled * * * dates of demolition * * *.

>> (vi) method of demolition * * *.

>> (vii) procedures to be employed * *."

Defendant challenges the indictment on two grounds: (1) that § 61.22(d) is improper; and (2) that the term "friable asbestos" is impermissibly vague and therefore defendant could not have knowingly perpetrated a falsehood.

Defendant first argues that the report in issue is not a report "under this chapter" within the meaning of § 1857c–8(c)(2) in that it is required by regulation rather than statute. That argument is without merit inasmuch as a regulation promulgated pursuant to statutory authority is "under this chapter."

Defendant next argues that § 61.22(d)(1) is not "under this chapter" in that it is not properly promulgated pursuant to § 1857c–9, which provides:

> "(a) For the purpose (i) of developing or assisting in the development of * * * *any emission standard* under section 1857c–7 of this title, (ii) of determining whether any person is in violation of *any such standard* —

> (1) The Administrator may require the owner or operator of any emission source to (A) establish and maintain such records, (B) make such reports, (C) install, use, and maintain such monitoring equipment or methods, (D) sample such emissions (in accordance with such methods,

at such locations, at such intervals, and in such manner as the Administrator shall prescribe), and (E) provide such other information as he may reasonably require;
\* \* \*."

Defendant contends that since there is no "emission standard," the regulation in issue is not promulgated for the purposes authorized, and that therefore it is inoperative. The argument has undeniable appeal, especially as it relates to "determining whether any person is in violation of any such standard," which assumes the existence of a standard. However, the regulation may also have been promulgated "for the purpose of developing" a standard, in which case, the existence of a viable standard is not necessary. In the absence of any argument by the government on that issue, this Court declines to reach a determination. It does note, with some degree of concern, the inconsistency that results from claiming the existence of a standard, and the simultaneous need for a regulation to aid in the development of one.

Defendant also contends that the term "friable asbestos" is vague, and that therefore there can be no knowingly false statement. The government counters, quite appropriately, that vagueness is to be measured by practice within the trade. Since the Court has been presented with no evidence as to its meaning, it will defer its decision as to jurisdiction and substance pending presentation of the facts. As a threshold matter, it would seek clarification of the precise charge against defendant. The nature of defendant's purported misstatement is unclear. If it simply did not report the existence of friable asbestos, there appears to be no violation of the statute, since § 61.22(d)(1) does not require such information. If, as the indictment charges, defendant affirmatively stated that there was no friable asbestos, there is a question as to whether the report was filed under § 61.22(d), as the indictment charges. Section 61.22(d) requires notice by owners of the demolition operation which involves friable asbestos. The fact that defendant said that there was none indicates that it may not have filed the report pursu-

ant to that section. In any event, the Court should inquire as to the precise circumstances and statement involved.

Accordingly, this Court's decision as to Count II is held in abeyance, pending appropriate presentation of facts and legal arguments.

IT IS SO ORDERED.